**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| PAUL PANES, Individually and on Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>       v.<br><br>TRINITY INDUSTRIES, INC., TIMOTHY R. WALLACE, and JAMES E. PERRY,<br><br>                    Defendants. | Case No. 3:15-cv-1316<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Paul Panes ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by TRINITY INDUSTRIES, INC. ("Trinity" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Trinity; and (c) review of other publicly available information concerning Trinity.

**NATURE OF THE ACTION AND OVERVIEW**

1.  This is a class action on behalf of purchasers of Trinity securities between February 19, 2014 and April 23, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  Trinity is a diversified industrial company that owns a variety of businesses providing products and services to the energy, transportation, chemical, and construction sectors.

Trinity reports its financial results in five principal business segments: the Rail Group, the Railcar Leasing and Management Services Group, the Inland Barge Group, the Construction Products Group, and the Energy Equipment Group.

3.      On October 20, 2014, a jury in Marshall, Texas found Trinity liable under the False Claims Act for failing to inform the Federal Highway Agency ("FHWA") of cost-cutting changes made to its highway guardrail system that allegedly made the systems lock up and puncture cars on impact. The jury awarded $175 million in damages based on its findings.

4.      In connection with the jury award, the FHWA ordered Trinity to retest the highway guardrail units. Those tests were successfully completed in March, and the Company announced that the completed tests had satisfied the FHWA's safety standards.

5.      Then, on April 21, 2015, after the market closed, an article was published on *Bloomberg*, stating that the U.S. Justice Department was conducting a criminal investigation into the FHWA's continued support of Trinity's highway guardrail system.  According to the article, a U.S. Attorney in Boston, the Federal Bureau of Investigation, and the Inspector General of the Transportation Department were coordinating the federal probe.

6.      On this news, shares of Trinity declined $3.43 per share, over 9%, to close on April 22, 2015, at $32.82 per share, on unusually heavy volume.

7.      On April 24, 2015, in a conference call with investors, the Company confirmed that the U.S. Department of Justice had initiated an investigation into Trinity, on this news, the Company's shares declined an additional $4.66 per share, or 14%, to close on April 24, 2015 at $28.70 per share on volume of over 13 million shares.

8.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company engaged in cost-cutting alterations to its ET-Plus guardrails; (2) that these alterations compromised the safety of its units; (3) that, the crash tests on the Company's products may have been flawed; (4) that, as a result, the Company faces additional civil and criminal liabilities; and (5) that, as a result of the foregoing, Defendants' statements about Trinity's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis in that the Company's liabilities were understated, and its financial projections were overstated; and (6) that, as a result of the foregoing, Defendants' statements about Trinity's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading

information, occurred in substantial part in this Judicial District.   Additionally, Trinity's principal executive offices are located within this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Trinity common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Trinity is a Delaware corporation with its principal executive offices located at 2525 N. Stemmons Freeway, Dallas, Texas 75207.

16.     Defendant Timothy R. Wallace ("Wallace") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Trinity.

17.     Defendant James E. Perry ("Perry") was, at all relevant times, Chief Financial Officer ("CFO") of Trinity.

18.     Defendants Wallace and Perry are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Trinity's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after,

their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Trinity is a diversified industrial company that owns a variety of businesses providing products and services to the energy, transportation, chemical, and construction sectors. Trinity reports its financial results in five principal business segments: the Rail Group, the Railcar Leasing and Management Services Group, the Inland Barge Group, the Construction Products Group, and the Energy Equipment Group.

### Materially False and Misleading
### Statements Issued During the Class Period

20.     The Class Period begins on February 19, 2014.  On this day, Trinity issued a press release entitled, "Trinity Industries, Inc. Announces Record Fourth Quarter and Full Year 2013 Results."  Therein, the Company, in relevant part, stated:

> Trinity Industries, Inc. (NYSE:TRN) today announced earnings results for the fourth quarter and full year ended December 31, 2013, including the following significant highlights:
>
> - **Record fourth quarter and full year 2013 earnings per common diluted share of $1.44 and $4.75, respectively**

- **Year-over-year fourth quarter and full year revenue growth of 24% and 15%, respectively, and earnings per common diluted share growth of 60% and 49%, respectively**

- **Rail Group receives orders for 7,125 new railcars during the fourth quarter resulting in a backlog of 39,895 units with a value of $5.0 billion**

- **Company repurchases 639,000 shares of its common stock during the quarter at a cost of $34.3 million, resulting in full-year repurchases of 2,473,000 shares at a cost of $108.2 million**

- **Company issues earnings guidance for full year 2014 reflecting record results of between $6.30 and $7.00 per common diluted share, a year-over-year increase of between 33% and 47%**

Trinity Industries, Inc. reported net income attributable to Trinity stockholders of $112.8 million, or $1.44 per common diluted share, for the fourth quarter ended December 31, 2013. Net income for the same quarter of 2012 was $71.3 million, or $0.90 per common diluted share. Revenues for the fourth quarter of 2013 increased 24% to $1.3 billion compared to revenues of $1.0 billion for the same quarter of 2012.

For the year ended December 31, 2013, the Company reported net income attributable to Trinity stockholders of $375.5 million, or $4.75 per common diluted share. In 2012, the Company reported net income of $255.2 million, or $3.19 per common diluted share. Revenues for the year ended December 31, 2013 were $4.4 billion, a 15% increase compared to revenues of $3.8 billion in 2012.

"I am pleased with our strong financial results for the fourth quarter and our overall performance during 2013," said Timothy R. Wallace, Trinity's Chairman, CEO and President.   "We achieved a number of key financial milestones, reporting record revenues, net income and earnings per share for both the fourth quarter and the full year. I am very proud of our people, whose capabilities and hard work enabled us to realign a portion of our manufacturing capacity to serve customers for products in the oil, gas, and chemical industries. During 2013, we announced two transactions with institutional investors desiring to invest in a portfolio of leased railcars, RIV 2013, a $1 billion railcar investment partnership, and Element Financial, through a $2 billion program agreement. I expect these transactions will continue to create value for the Company."

Mr. Wallace added, "During 2014, we will continue to invest resources to position our company to pursue opportunities for infrastructure-related products that support the growing needs in the energy, chemical, transportation, and construction industries. We have a great deal of positive momentum occurring within Trinity."

**Business Group Results**

\*       \*       \*

Revenues in the Construction Products Group were $117.5 million in the fourth quarter of 2013 compared to revenues of $109.8 million in the fourth quarter of 2012. The Group recorded an operating profit of $7.3 million in the fourth quarter of 2013 compared to an operating profit of $9.4 million in the fourth quarter of 2012. Revenues increased for the fourth quarter of 2013 compared to the same period in 2012 primarily due to higher acquisition-related volumes in our Aggregates business while operating profit decreased due to product mix changes. In March 2013, the Company completed the sale of its remaining ready-mix concrete operations which have been historically reported as a component of the Construction Products Group. This divestiture is considered a discontinued operation and, accordingly, the effects of its operations have been excluded from the Construction Products Group for financial reporting purposes.

At December 31, 2013, the Company had cash and marketable securities of $578.2 million. When combined with capacity under committed credit facilities, the Company had approximately $1.3 billion of available liquidity at the end of the fourth quarter.

21.    On February 20, 2014, Trinity filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year.  The Company's Form 10-K was signed by Defendants Wallace and Perry, and reaffirmed the Company's statements previously announced on February 19, 2014.

22.    On April 29, 2014, Trinity issued a press release entitled, "Trinity Industries, Inc. Announces Record First Quarter 2014 Results and Increases Full Year 2014 Earnings Guidance."  Therein, the Company, in relevant part, stated:

Trinity Industries, Inc. (NYSE:TRN) today announced earnings results for the first quarter ended March 31, 2014, including the following significant highlights:

- **Record quarterly earnings per common diluted share of $2.85, a 188% increase year-over-year**

- **Record quarterly revenue and net income of $1.5 billion and $226.4 million, respectively, a year-over-year increase of 57% and 186%, respectively**

- **Anticipates full year 2014 earnings per common diluted share of between $7.00 and $7.50, compared to its previous full year 2014 earnings guidance of between $6.30 and $7.00**

- **Rail Group receives orders for 9,625 new railcars during the first quarter resulting in a record backlog of 42,630 units with a record value of $5.2 billion**

- **Inland Barge Group receives orders with a value of $215 million, resulting in a backlog with a value of $508 million**

- **Receives total proceeds of $514 million from the sale of new and existing leased railcars to Element Financial Corporation under the Company's strategic alliance formed last December**

- **Energy Equipment Group invests $118 million in three previously announced acquisitions of energy-related assets serving the cryogenic containers market and well-site and midstream production activities**

<u>Consolidated Results</u>

Trinity Industries, Inc. reported net income attributable to Trinity stockholders of $226.4 million, or $2.85 per common diluted share, for the first quarter ended March 31, 2014. Net income for the same quarter of 2013 was $79.1 million, or $0.99 per common diluted share, including $6.6 million, or $0.08 per common diluted share, from discontinued operations. Revenues for the first quarter of 2014 increased 57% to $1.5 billion compared to revenues of $932.9 million for the same quarter of 2013. First quarter 2014 results benefitted from a lower effective tax rate of 32.5% primarily due to certain domestic manufacturing tax deductions, lower state taxes, and the partnership tax status of the Company's non-controlling interests.

"The Company sustained its positive momentum during the first quarter, reporting a record level of net income and EPS that exceeded prior record levels by a wide margin," said Timothy R. Wallace, Trinity's Chairman, CEO and President."During the first quarter, all of our business groups improved their results, increasing both operating profit and margin compared to the prior year. Since the fourth quarter of 2010, we have been successful in extending year-over-year growth in revenue and net income. These are tremendous accomplishments, and I am very proud of our people, whose capabilities and hard work enabled us to realign our manufacturing capacity to meet strong demand for our products and services that support the oil, gas, and chemicals industries."

Mr. Wallace added, "I am pleased with the value we are creating from the strategic railcar leasing transactions we have completed over the last year. Our leasing platform provides the Company with a tremendous amount of financial flexibility, creating capital available to invest across our portfolio of businesses

and grow through acquisitions. During the first quarter of 2014, we acquired the assets of three manufacturing companies that provide us with important competencies as we grow our presence in the energy markets. We will continue to invest resources to position our company for continued growth."

**Business Group Results**

*     *     *

Revenues in the Construction Products Group were $113.1 million in the first quarter of 2014 compared to revenues of $103.8 million in the first quarter of 2013. Revenues increased for the first quarter of 2014 compared to the same period in 2013 primarily due to higher acquisition-related volumes in our Aggregates business. The Group recorded an operating profit of $21.7 million in the first quarter of 2014 compared to an operating profit of $7.7 million in the first quarter of 2013. Included in the operating results for the first quarter of 2014, and the Company's first quarter earnings guidance provided in February, is an $11.2 million gain from the sale of certain land held by our Aggregates business.

23.     On April 30, 2014, Trinity filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter. The Company's Form 10-Q was signed by Defendant Perry, and reaffirmed the Company's statements previously announced on April 29, 2014.

24.     On July 30, 2014, Trinity issued a press release entitled, "Trinity Industries, Inc. Announces Strong Second Quarter 2014 Results and Increases Full Year 2014 Earnings Guidance." Therein, the Company, in relevant part, stated:

Trinity Industries, Inc. (NYSE:TRN) today announced earnings results for the second quarter ended June 30, 2014, including the following significant highlights and adjusted for the 2-for-1 stock split completed during the quarter:

- **Quarterly earnings per common diluted share of $1.01, a 94% increase year-over-year**

- **Quarterly revenue and net income of $1.5 billion and $164.2 million, respectively, a year-over-year increase of 39% and 95%, respectively**

- **Rail Group receives orders for 9,880 new railcars during the second quarter resulting in a record backlog of 45,350 units with a record value of $5.5 billion**

- **Entered into an agreement to acquire the assets of Meyer Steel Structures, the utility steel structures division of Thomas & Betts Corporation, a member of the ABB Group, for a purchase price of approximately $600 million**

- **Anticipates full year 2014 earnings per common diluted share of between $3.90 and $4.10, excluding any effect of the Meyer Steel Structures acquisition. This compares to previous full year 2014 earnings guidance of between $3.50 and $3.75**

<u>Consolidated Results</u>

Trinity Industries, Inc. reported net income attributable to Trinity stockholders of $164.2 million, or $1.01 per common diluted share, for the second quarter ended June 30, 2014. Net income for the same quarter of 2013 was $84.0 million, or $0.52 per common diluted share. Revenues for the second quarter of 2014 increased 39% to $1.5 billion compared to revenues of $1.1 billion for the same quarter of 2013. Second quarter 2014 results benefitted from a lower effective tax rate of 32.6% primarily due to certain domestic manufacturing tax deductions, lower state taxes, and the partnership tax status of the Company's non-controlling interests.

"I am pleased with our strong results for the second quarter and our ability to build upon the positive momentum occurring within Trinity over the last several years," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Consolidated revenues increased 39% year-over-year and  net earnings nearly doubled, outpacing revenue growth by a wide margin.  The amount of operating leverage we obtained and the record $6.5 billion backlog in our major businesses at the end of the second quarter were impressive."

Mr. Wallace added, "We believe this momentum and the investments we have made in 2014 position us well. Our recently announced agreement to acquire the assets of Meyer Steel Structures is expected to close in the third quarter, subject to regulatory approval. Meyer's strong engineering reputation, manufacturing capabilities, and products with high steel content align well with Trinity's existing competencies and offer opportunities to create additional value. The acquisition will broaden Trinity's product portfolio and supports our vision of being a premier, diversified industrial company."

<u>Business Group Results</u>

*      *      *

Revenues in the Construction Products Group were $151.7 million in the second quarter of 2014 compared to revenues of $154.5 million in the second quarter of 2013. Revenues decreased for the second quarter of 2014 compared to the same period in 2013 primarily due to lower volumes in the Highway Products business

partially offset by higher acquisition-related volumes in the Aggregates business. The Group recorded an operating profit of $22.4 million in the second quarter of 2014 compared to an operating profit of $19.0 million in the second quarter of 2013.

25.     On July 30, 2014, Trinity filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Perry, and reaffirmed the Company's statements previously announced on July 29, 2014.

26.     On October 20, 2014, Trinity issued a press release entitled, "Statement by Trinity Industries, Inc."  Therein, the Company, in relevant part, stated:

> Earlier today a jury in the U.S. District Court for the Eastern District of Texas returned a verdict against Trinity Industries, Inc. (NYSE:TRN) in a False Claims Act case. The jury awarded $175 million in damages.
>
> The Company respects the jury's decision. However, Trinity believes the decision cannot and will not withstand legal scrutiny. The Company strongly believes the courts will affirm its position.

27.     On October 24, 2014, Trinity issued a press release entitled, "Trinity Highway Products to Stop Shipments of ET-Plus® System."  Therein, the Company, in relevant part, stated:

> Trinity Highway Products, LLC announced today that it will stop the shipment of the ET-Plus® System until additional crash testing can be completed.
>
> The Federal Highway Administration (FHWA) recently requested additional crash testing of the ET-Plus® System in support of its ongoing evaluation of the ET-Plus® System. The Company will continue working with FHWA related to further testing and will stop shipment of the product until requested testing is completed.
>
> "In light of FHWA's request, the right thing to do is to stop shipping the product until the additional testing has been completed," said Gregg Mitchell, President, Trinity Highway Products, LLC.  "We have confidence in the ET-Plus® System as designed and crash tested by Texas A&M Transportation Institute.  It has met all tests previously requested by FHWA. We take the safety of the products we manufacture very seriously," Mitchell said.

28.     On October 28, 2014, Trinity issued a press release entitled, "Trinity Industries, Inc. Announces Strong Third Quarter 2014 Results."  Therein, the Company, in relevant part, stated:

> Trinity Industries, Inc. (NYSE:TRN) today announced earnings results for the third quarter ended September 30, 2014, including the following significant highlights:
>
> - **Quarterly earnings per common diluted share of $0.90, a 43% increase year-over-year**
>
> - **Quarterly revenue and net income of $1.56 billion and $149.4 million, respectively, a year-over-year increase of 41% and 50%, respectively**
>
> - **Rail Group receives orders for 14,120 new railcars during the third quarter resulting in a record backlog of 51,725 units with a record value of $6.1 billion**
>
> - **Completed the acquisition of the assets of Meyer Steel Structures ("Meyer"), the utility steel structures division of Thomas & Betts Corporation, a member of the ABB Group, on August 18, for a purchase price of approximately $593 million**
>
> - **Anticipates full year 2014 earnings per common diluted share of between $4.08 and $4.16**
>
> <u>Consolidated Results</u>
> Trinity Industries, Inc. reported net income attributable to Trinity stockholders of $149.4 million, or $0.90 per common diluted share, for the third quarter ended September 30, 2014. Net income for the same quarter of 2013 was $99.6 million, or $0.63 per common diluted share. Revenues for the third quarter of 2014 increased 41% to a record $1.56 billion compared to revenues of $1.11 billion for the same quarter of 2013.
>
> "During the third quarter, Trinity generated record revenues and its 17th consecutive quarter of year-over-year growth in net earnings," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Our major businesses reported a record combined backlog valued at more than $7.1 billion at the end of the third quarter, representing 15% growth year-over-year. I continue to be impressed with our team of people and the amount of operating leverage they are obtaining. Their capabilities and hard work have enabled us to realign our manufacturing capacity to meet strong demand for our products and services that support the North American energy renaissance."

Mr. Wallace added, "In addition to reporting strong financial results during the quarter, we made continued progress toward achieving our vision of being a premier, diversified industrial company. This progress is demonstrated by the more than $700 million we have committed to acquisitions in our Energy Equipment Group thus far in 2014. The integration of Meyer Steel Structures, which closed in August, is progressing smoothly."

**Business Group Results**

\*       \*       \*

Revenues in the Construction Products Group were $170.4 million in the third quarter of 2014 compared to revenues of $149.2 million in the third quarter of 2013. The Group recorded an operating profit of $21.6 million in the third quarter of 2014 compared to an operating profit of $18.6 million in the third quarter of 2013. Revenues and operating profit increased for the third quarter of 2014 compared to the same period in 2013 primarily due to higher volumes.

\*       \*       \*

**Highway Products Litigation**

On October 20, 2014, a jury in a federal district court in Marshall, Texas returned a verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the False Claims Act (the "Act") to $525 million. Additionally, the district court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The district court has not yet entered a final judgment or determined a civil penalty amount. The Company maintains that the allegations are without merit and intends to vigorously defend its positions in post-trial motions and on appeal to the United States Court of Appeals for the Fifth Circuit. Pending entry of a final judgment and completion of the Company's post-trial and appellate activities in this matter, the Company currently does not believe that a loss is probable, therefore no accrual has been included in the consolidated financial statements.

**Earnings Outlook**

The Company's earnings guidance for the fourth quarter is between $0.75 and $0.83 per common diluted share, which includes the impact from the Meyer acquisition. This results in full year 2014 earnings guidance of between $4.08 and $4.16 per common diluted share compared to previous guidance of between $3.90 and $4.10 per share, which excluded any impact from Meyer. The Company's earnings guidance compares to fourth quarter and full year 2013 earnings per

common diluted share of $0.72 and $2.38, respectively. The acquisition of Meyer has a minimal impact on earnings in 2014, after considering the additional amortization expense associated with acquired intangibles other than goodwill and approximately $9.8 million of one-time transaction expenses incurred year-to-date, $7.5 million of which were reported in the third quarter. Actual results may differ from present expectations, as noted below.

29.    On October 29, 2014, Trinity filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Perry, and reaffirmed the Company's statements previously announced on October 28, 2014.

30.    On January 9, 2015, Trinity issued a press release entitled, "Trinity Highway Products Provides Progress Update on ET Plus® System Testing."  Therein, the Company, in relevant part, stated:

Today, Trinity Highway Products, LLC (a subsidiary of Trinity Industries, Inc., NYSE: TRN) announced that, on January 6, it completed the fourth of eight tests requested by the Federal Highway Administration ("FHWA") of the ET Plus® System. While the tests are data driven, requiring analysis of the full data set before conclusive determinations can be made, the ET Plus® System appears to have performed within the Company's expectations during these four tests. Official test results will be released by the FHWA following their analysis of the data.

The federal standard is for guardrails to be installed on U.S. highways at heights between 27 ¾" and 31". The FHWA has requested four tests be completed at 27 ¾" and four tests at 31" guardrail heights, making a total of eight tests. The first four tests were conducted at a guardrail height of 27 ¾". The vast majority of ET Plus® Systems the Company has sold were for installations at the 27 3/4" guardrail height. The second series of four tests, scheduled to be completed by the end of January, will be conducted at the 31" height.

These tests are being conducted in accordance with National Cooperative Highway Research Program Report 350. Report 350 sets forth the safety performance evaluation procedures applicable to the ET Plus® System and many other roadside safety features used on U.S. highways. The ET Plus® extruder heads currently undergoing testing were randomly selected by the FHWA from inventory at the California Department of Transportation and are representative of what is in use on U.S. highways.

31.     On February 6, 2015, Trinity issued a press release entitled, "Trinity Highway Products ET Plus® System Passes First Four NCHRP Report 350 Tests."   Therein, the Company, in relevant part, stated:

> 27¾" Height Tests Cover "Vast Majority" of Systems Installed Nationwide
>
> The Federal Highway Administration (FHWA) has released the first four crash test results conducted at the 27¾" installation height of the ET Plus® System. These tests passed and comprise the first series of the FHWA requested National Cooperative Highway Research Program (NCHRP) Report 350 tests. The 27¾" height system accounts for a vast majority of the ET Plus® Systems installed on highways nationwide.
>
> The test results for these first four passed tests can be found at: http://www.etplusfacts.com.
>
> These test results validate Trinity Highway Products' long standing position that when installed, maintained and impacted within the Report 350 standards, the 27¾" height ET Plus® System performs to Report 350 criteria. When all eight test results are reviewed and released by the FHWA, the company will perform a thorough analysis before resuming any shipments of the ET Plus® System to its customers.
>
> These tests were conducted in accordance with Report 350 at Southwest Research Institute (SwRI), an accredited and independent research facility. Report 350 sets forth the performance evaluation criteria applicable to the ET Plus® System and many other roadside safety features used on U.S. highways. The ET Plus® extruder heads tested in all eight tests were randomly selected by the FHWA from inventory at the California Department of Transportation. These extruder heads complied with all design tolerances and are representative of what is in use on U.S. highways.
>
> Trinity Highway Products has completed testing the ET Plus® System at the 31" height as outlined in the test plan submitted to the FHWA. SwRI is analyzing the results of these tests. The results will be released when the data is fully analyzed by the FHWA.

32.     On February 18, 2015, Trinity issued a press release entitled, "Trinity Industries, Inc. Announces Strong Fourth Quarter and Record Full Year 2014 Results."   Therein, the Company, in relevant part, stated:

Trinity Industries, Inc. (NYSE:TRN) today announced earnings results for the fourth quarter and full year ended December 31, 2014, including the following significant highlights:

- **Strong fourth quarter and record full year earnings per common diluted share of $0.86 and $4.19, respectively**

- **Year-over-year fourth quarter and full year revenue growth of 32% and 41%, respectively, and earnings per common diluted share growth of 19% and 76%, respectively**

- **All business segments report year-over-year revenue and operating profit growth during 2014**

- **Rail Group receives orders for 17,770 new railcars during the fourth quarter with a record value of over $2.1 billion resulting in an all-time high backlog of 61,035 units with a record value of $7.2 billion**

- **Company issues earnings guidance for full year 2015 of between $4.00 and $4.40 per common diluted share**

<u>Consolidated Results</u>

Trinity Industries, Inc. reported net income attributable to Trinity stockholders of $138.2 million, or $0.86 per common diluted share, for the fourth quarter ended December 31, 2014. Net income for the same quarter of 2013 was $112.8 million, or $0.72 per common diluted share. Revenues for the fourth quarter of 2014 increased 32% to a record $1.7 billion compared to revenues of $1.3 billion for the same quarter of 2013.

For the year ended December 31, 2014, the Company reported record net income attributable to Trinity stockholders of $678.2 million, or $4.19 per common diluted share. In 2013, the Company reported net income of $375.5 million, or $2.38 per common diluted share. Revenues for the year ended December 31, 2014 were $6.2 billion, a 41% increase compared to revenues of $4.4 billion in 2013.

"During 2014, we utilized the strengths of our integrated business model to achieve record financial results, with all of our business segments reporting higher revenue and profit," said Timothy R. Wallace, Trinity's Chairman, CEO and President. "Our Rail Group received a record number of orders in 2014, and its $7.2 billion order backlog provides significant production visibility. Our Leasing Group achieved record financial results in 2014 and generated strong earnings and cash flow from strategic railcar leasing transactions completed during the year. We invested over $700 million in acquisitions within our Energy Equipment Group, which added complementary product lines that provide long-term growth opportunities."

**Business Group Results**

\*       \*       \*

Revenues in the Construction Products Group were $116.5 million in the fourth quarter of 2014 compared to revenues of $117.5 million in the fourth quarter of 2013. The Group recorded an operating loss of $0.3 million in the fourth quarter of 2014 compared to an operating profit of $7.3 million in the fourth quarter of 2013. Revenues and operating profit decreased for the fourth quarter of 2014 compared to the same period in 2013 primarily due to lower volumes in our Highway Products business.

\*       \*       \*

**Highway Products Litigation**

On October 20, 2014, a jury in a federal district court returned a verdict against the Company in a False Claims Act (the "Act") case and awarded $175 million in damages. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the district court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The district court has not yet entered a final judgment or determined a civil penalty amount. The Company maintains that the allegations are without merit and intends to vigorously defend its positions in post-trial motions and on appeal. Pending entry of a final judgment and completion of the Company's post-trial and appellate activities in this matter, the Company currently does not believe that a loss is probable, therefore no accrual has been included in the consolidated financial statements.

**Earnings Outlook**

For the full year of 2015, the Company anticipates earnings per common diluted share of between $4.00 and $4.40 compared to full year earnings per common diluted share of $4.19 in 2014. The Company expects the level of quarterly earnings per share in 2015 to be relatively consistent throughout the year. As a reminder, first quarter 2014 results included $0.72 per common diluted share of earnings related to sales of new and existing leased railcars to Element. As a result, we do expect first quarter 2015 earnings per common diluted share to be below last year's level.

Actual results in 2015 may differ from present expectations and could be impacted by a number of factors including, among others, fluctuations in prices of commodities that our customers produce and transport; potential costs or timing of pending tank car regulatory changes; expenses related to current and potential litigation in our Highway Products business; various labor situations in the U.S., including those causing the temporary shut-down of oil refineries as well as interruptions of imports and exports on the West Coast; the operating leverage

and efficiencies that can be achieved by the Company's manufacturing businesses; the level of sales and profitability of railcars; and the impact of weather conditions on our operations and delivery schedules.

33.     On February 19, 2015, Trinity filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.  The Company's Form 10-K was signed by Defendants Wallace and Perry, and reaffirmed the Company's statements previously announced on February 18, 2015. Therein, the Company, in relevant part, stated:

We previously reported that on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act ("Act") complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division ("District Court") styled Joshua Harman, on behalf of the United States of America, Plaintiff/Relator v. Trinity Industries, Inc., Defendant, Case 2:12-cv-00089-JRG. Mr. Harman alleged the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the Company's ET-Plus® System, a highway guardrail end-terminal ("ET Plus"), in order for such purchasers to obtain Federal-aid reimbursement for payments made on such purchases. On October 20, 2014 a trial of this case concluded with a jury verdict stating that the Company and its subsidiary, Trinity Highway Products, LLC, "knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim," awarding $175 million in damages based on such finding. The jury's damages award, to the extent it survives the Company's challenge in post-trial motions or on appeal, is automatically trebled under the Act to $525 million. Additionally, the District Court is required to impose civil penalties for each violation of the Act (which penalties are not automatically trebled). The District Court has the discretion to establish the civil penalty amount between $5,500 and $11,000 per violation. In this regard, the Relator contended during trial that certain invoices submitted to purchasers of the ET Plus certified that the product was accepted by the Federal Highway Administration ("FHWA") and was therefore eligible for Federal-aid reimbursement. Based on Relator's damages model in this respect, the range of possible civil penalties is $5,500 (if the District Court determines there has been a single violation) to $184 million (if the District Court determines that each invoice for the product was a violation).

The District Court has not yet entered a final judgment or determined a civil penalty amount. While the Company believes the District Court does not have the evidence required under the law to quantify civil penalties, the total range of loss in this case, based on the jury's verdict and Mr. Harman's damage model for civil penalties, is $525 million to $709 million, exclusive of attorney's fees, costs, and interest.

The Company maintains that Mr. Harman's allegations are without merit. Accordingly, the Company intends to challenge the damages award on the ground of insufficient evidence and to vigorously defend its positions in post-trial motions and on appeal to the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"). Such post-trial motions and appellate review will result in certain legal expenses, including potential costs associated with posting a supersedeas bond upon the District Court's entry of a final judgment. The face amount of such bond could equal the amount of the final judgment entered plus twenty (20) percent. The Company has confidence that such bond will be issued if, when, and to the extent required.

Texas A&M Transportation Institute ("TTI"), a member of The Texas A&M University System, designed the technology employed in the ET Plus. The Texas A&M University System is the owner of patents issued by the U.S. Patent Office that cover the ET Plus. Trinity Highway Products manufactures and markets the ET Plus pursuant to an exclusive license granted by The Texas A&M University System of their intellectual property. Trinity Highway Products contracted with TTI to conduct crash testing of the ET Plus to demonstrate compliance with the required standards set out in National Cooperative Highway Research Program Report 350 ("Report 350"). In addition, TTI prepared and provided to Trinity Highway Products the test reports on the performance of the ET Plus for review by the FHWA in their consideration for accepting the product for use on the national highway system and determining the product's eligibility for Federal-aid reimbursement. It is our belief that since its introduction in 2000, including all subsequent improvement modifications recommended by TTI, the ET Plus has been in compliance with Report 350 and has been, and is currently, accepted by the FHWA for Federal-aid reimbursement eligibility. In a Memorandum dated June 17, 2014, the FHWA confirmed to its Division Administrators, Directors of Field Services, Federal Lands Division Engineers, that "The Trinity ET Plus with 4-inch guide channels became eligible for Federal-aid reimbursement under FHWA letter CC-94 on September 2, 2005. In addition, the device is eligible for reimbursement under FHWA letters CC-94A and CC-120." In its memorandum, the FHWA further confirmed the reimbursement eligibility of the device at guardrail heights from 27 3/4 inches to 31 inches, stating that an "unbroken chain of eligibility for Federal-aid reimbursement has existed since September 2, 2005 and the ET Plus continues to be eligible today."

A trial in this matter commenced in July 2014, but ended in a mistrial declared by the District Court on its own volition. Preceding the second trial in this matter, the Company filed a Petition for Writ of Mandamus with the Fifth Circuit based, in part, on the District Court's failure to apply Fifth Circuit case law precedent as well as other precedential case law. In its per curiam order denying the Company's Petition for Writ of Mandamus, the Fifth Circuit expressed concern regarding the District Court's failure to issue a reasoned ruling rejecting the Company's prior motions for judgment as a matter of law. The Fifth Circuit also stated that the FHWA authoritative memorandum dated June 17, 2014, on its face,

appears to compel the conclusion that the FHWA, after due consideration of all the facts, found the ET Plus sufficiently compliant with federal safety standards and therefore fully eligible, in the past, present and future, for Federal-aid reimbursement claims. Additionally, the Fifth Circuit noted that a strong argument could be made that the Company's actions were neither material nor were any false claims based on false certifications presented to the government. Based on the Fifth Circuit's remarks, the Company re-urged its motions with the District Court for judgment as a matter of law, which the District Court denied during trial. We believe this reinforces our prospects for a successful outcome.

Revenues from sales of the ET Plus in the United States, included in the Construction Products Group, totaled approximately $35.1 million and $46.0 million for the years ended December 31, 2014 and 2013, respectively.

Pending entry of a final judgment and completion of the Company's post-trial and appellate activities in this matter, we currently do not believe that a loss is probable, therefore no accrual has been included in the accompanying consolidated financial statements.

At December 31, 2014, the Company had unrestricted cash, cash equivalents, and short-term marketable securities of $962.9 million. When combined with capacity under committed credit facilities, the Company had approximately $1.6 billion of available liquidity at the end of the fourth quarter.

On October 21, 2014, in light of the jury's finding, the FHWA requested that the Company perform eight (8) additional crash tests of the ET Plus to support the FHWA's ongoing evaluation of ET Plus performance. The eight tests were comprised of four tests at a guardrail height of 27 3/4" and four tests at a guardrail height of 31". On October 24, 2014, the Company issued a press release stating that it will stop shipments of the ET Plus until additional crash testing of the ET Plus was completed. The requested tests were conducted in December 2014 and January 2015, in accordance with Report 350 at Southwest Research Institute, an FHWA-approved and independent research facility. Report 350 sets forth the performance evaluation criteria applicable to the ET Plus and many other roadside safety features used on U.S. highways. The ET Plus extruder heads tested in all eight tests were randomly selected by the FHWA from inventory at the California Department of Transportation. These extruder heads were representative of what is in use on U.S. and Canadian highways.

On January 27, 2015, Trinity Highway Products completed the eighth, and final, test. On February 6, 2015, the FHWA released the crash test results of the first four tests conducted at the 27 3/4" installation height of the ET Plus. This release reports that the ET Plus passed Report 350 crash test criteria at the 27 3/4" guardrail height. The vast majority of guardrails installed on the roadways in the U.S. and Canada are at the 27 3/4" height. These test results validate Trinity Highway Products' long standing position that when installed, maintained and

impacted within the Report 350 standards, the 27 3/4" height ET Plus performs to Report 350 criteria. When all eight test results are reviewed and released by the FHWA, the Company will perform a thorough analysis before resuming any shipments of the ET Plus to its customers.

As of the date on which the eighth test was concluded, Trinity is aware of 42 states that had removed the ET Plus from their respective qualified products list. The state of Virginia, in addition to evaluating a potential recall of all ET Plus products installed on Virginia roadways, has joined Mr. Harman's Virginia state action alleging the same false claims as were alleged in the false claims act case pending in the Eastern District of Texas. Other states could take similar or different actions regarding recall, and could be considering similar state false claims litigation against the Company. While the financial impacts of such actions are currently unknown, they could be material.

The Company is aware of two class action lawsuits involving claims pertaining to the ET Plus. The Company has received service of process in a lawsuit filed November 6, 2014, titled <u>Hamilton County, Illinois and Macon County, Illinois, Individually and on behalf of all Other Counties in the State of Illinois vs. Trinity Industries, Inc. and Trinity Highway Products, LLC</u>. In this case it is alleged that the Company and Trinity Highway Products made a series of un-tested modifications to the ET Plus and falsely certified that the modified ET Plus was acceptable for use on the nation's highways based on federal testing standards and approval for Federal-aid reimbursement. The Plaintiffs further allege breach of express and implied warranties, violation of the Uniform Deceptive Trade Practices Act and unjust enrichment, for which Plaintiffs seek actual damages related to purchases of the ET Plus, compensatory damages for establishing a common fund for class members, punitive damages, and injunctive relief. The case is filed in the United States District Court for the Southern District of Illinois and is being brought by Plaintiffs for and on behalf of themselves and the other 101 counties of the State of Illinois. The Company is also aware of, but has not received service of process in a lawsuit filed February 11, 2015 titled The Corporation of the City of Stratford and Trinity Industries, Inc., Trinity Highway Products, LLC, and Trinity Industries Canada, Inc. pending in Ontario Superior Court of Justice. The class in this matter has been identified as persons in Canada who purchased and/or used an ET Plus guardrail end terminal. The Statement of Claim in this litigation generally alleges that Trinity Industries, Inc., Trinity Highway Products, and Trinity Industries Canada, failed to warn of dangers associated with undisclosed modifications to the ET Plus guardrail end terminals, breached its implied warranty, breached its duty of care, and was negligent. Plaintiff is seeking $400 million in compensatory damages and $100 million in punitive damages. In the alternative to damages, Plaintiff further pleads an entitlement to "waive the tort" and claim an accounting or other such restitution remedy for disgorgement of the revenues generated by Trinity Industries, Inc., Trinity Highway Products, and Trinity Industries Canada as a result of the sale of the modified ET Plus guardrail end terminals in Canada, due to the product not

being fit for its intended purpose and/or the failure to disclose the modifications and/or risks associated with the modifications to the ET Plus guardrail end terminals. The Company believes each of these lawsuits are without merit and intends to vigorously defend these allegations. While the financial impacts of these two actions are currently unknown, they could be material.

The Company is currently defending a number of product liability lawsuits in several different states that are alleged to involve the ET Plus. These cases are diverse in light of the randomness of collisions in general and the fact that each accident involving roadside devices such as an ET Plus, or any other fixed object along the highway has its own unique facts and circumstances. Report 350 recognizes that performance of even the most carefully researched roadside device is subject to physical laws and the crash worthiness of vehicles. The Company expects the jury verdict, coupled with the media attention the verdict has generated, will prompt the plaintiff's bar to seek out vehicle accident victims involved in collisions with an ET Plus as potential clients, which may result in additional product liability lawsuits being filed against the Company. The Company carries general liability insurance to mitigate the impact of adverse verdict exposures in these product liability cases.

The Company has received information that several law firms are investigating whether certain officers and directors of the Company breached their fiduciary duties relating to modifications made to the ET Plus and/or violated federal securities laws. We believe these investigations will be concluded without substantive results. However, the Company may incur legal expenses and related costs in responding to these investigations.

*Train derailment*

As previously reported, the Company was named as a respondent in litigation filed July 15, 2013 in Superior Court, Province of Quebec, District of Saint-Francois, styled Yannick Gagne and Guy Ouellet vs. Rail World, Inc., et al related to the July 2013 crude oil unit train derailment in Lac-Mégantic, Quebec. A partially-owned subsidiary of the Company owned and leased to a third party 13 of the railcars involved in the incident, which lessee is also named as a defendant in the Province of Quebec litigation. As of June 18, 2014, the petitioners in the Quebec litigation have voluntarily desisted with their claims against the Company resulting in the dismissal of the Company without prejudice; however the partially-owned subsidiary remains as a respondent in the litigation. The litigation filed in Quebec is seeking "class" status which, if certified, could lead to multiple individuals and business entities becoming class members.

The Company was also named as a defendant in multiple cases filed by the estates of decedents in the Circuit Court of Cook County, Illinois seeking damages for alleged wrongful death and property damage arising from the July 2013 crude oil unit train derailment in Lac-Mégantic, Quebec. The Company's tank car

manufacturing subsidiary manufactured 35 of the 72 tank railcars involved in the derailment. However the Illinois cases have since been ordered transferred to the United States District Court for the District of Maine. This transfer prompted plaintiffs to seek dismissal of these actions. Nonetheless, the Maine court has not indicated those dismissals were effectuated and the cases were transferred to federal court in Maine and have been assigned new case numbers. Certain of the plaintiffs in these transferred cases have appealed to the U.S. Court of Appeals for the First Circuit seeking to overturn the decision to transfer. This appeal has resulted in a stay of all proceedings in the transferred cases pending resolution of the appeal. The Company could be named in similar litigation involving other affected plaintiffs, but the ultimate number of claims and the jurisdiction in which such claims are filed, may vary. The Company has recorded an accrual of $11.4 million at December 31, 2014 related to this matter of which expected third-party recoveries of $10.2 million are recorded in other assets at December 31, 2014. We do not believe at this time that an additional loss is probable nor can a range of additional losses be determined.

34.     On March 13, 2015, Trinity issued a press release entitled, "Trinity Highway Products ET Plus® System Passes All Eight NCHRP Report 350 Tests."  Therein, the Company, in relevant part, stated:

*FHWA Confirms there is only One Version of the ET Plus Head*

The ET Plus® System has passed all eight Federal Highway Administration requested crash tests.

The FHWA today released results for the final four crash tests of the ET Plus® System, confirming all four tests passed. The four tests were conducted at the 31" installation height and are the final four of eight tests requested by the FHWA last October. All eight tests were conducted under National Cooperative Highway Research Program (NCHRP) Report 350 criteria. Report 350 sets forth the performance evaluation criteria applicable to the ET Plus® System and many other roadside safety features used on U.S. highways.

The test results for all of the eight passed tests can be found at: http://www.etplusfacts.com.

In addition, earlier this week, the FHWA and the American Association of State Highway and Transportation Officials (AASHTO) confirmed there is only one version of the ET Plus® System extruder head. They confirmed the products tested by the FHWA are representative of the ET Plus® System installed on U.S. roadways.

The ET Plus® is a robust end terminal system that performs as designed pursuant to NCHRP Report 350 criteria when properly installed and maintained.

The ET Plus® System has been successfully crash tested more times than any product of its kind. It has an unbroken chain of eligibility for federal-aid reimbursement from the FHWA.

These tests were conducted in accordance with Report 350 at Southwest Research Institute (SwRI), an accredited and independent research facility. The ET Plus® extruder heads tested in all eight tests were randomly selected by the FHWA from inventory at the California Department of Transportation.

35.     The statements contained in ¶¶20-34 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company engaged in cost-cutting alterations to its ET-Plus guardrails; (2) that these alterations compromised the safety of its units; (3) that, the crash tests on the Company's products may have been flawed; (4) that, as a result, the Company faces additional civil and criminal liabilities; and (5) that, as a result of the foregoing, Defendants' statements about Trinity's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis in that the Company's liabilities were understated, and its financial projections were overstated; and (6) that, as a result of the foregoing, Defendants' statements about Trinity's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

36.     On April 21, 2015, after the market closed, an article was published on *Bloomberg*, entitled, "U.S. Opens Criminal Probe Into Highway Guardrails Alleged to Turn Into Spears on Impact."  Therein, the article, in relevant part, stated:

The U.S. Justice Department is conducting a criminal investigation into the use of a highway guardrail system linked to at least eight deaths, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.

Word of the inquiry comes weeks after Trinity appeared poised to move on from more than a year of scrutiny in courts and from states over the performance of its embattled ET-Plus, a product meant to blunt the impact of cars that crash headlong into guardrails. In March, Trinity's system passed a closely watched series of crash tests ordered by the Federal Highway Administration, the government agency that certifies the safety of roadside hardware.

Now, federal investigators are interviewing potential witnesses about issues including Trinity's relationship with the FHWA, according to these people. Investigators from a public corruption and special prosecutions unit of the Justice Department have subpoenaed documents from court battles involving Trinity's ET-Plus on behalf of a grand jury, according to one of these people.

"Trinity has not been contacted by the Department of Justice," Jeff Eller, a spokesman for Dallas-based Trinity, said in an e-mail about the U.S. probe. "Should they do so, we will respond openly to all requests for information."

**Design Changes**

The investigation indicates that the most serious turn in Trinity's guardrail saga may be yet to come, adding the specter of criminal wrongdoing to previous allegations of fraud and deadly design changes. Trinity fell 7 percent at 11:11 a.m. in New York trading Wednesday after dropping as much as 8 percent on news of the probe.

In October, a Texas jury ruled in a whistle-blower lawsuit that Trinity had cheated taxpayers, who help foot the bill for roadside safety gear, of $175 million by changing certain dimensions of the ET-Plus in 2005 without telling the FHWA.

Those cost-cutting alterations caused the unit to malfunction, plaintiffs have said in more than a dozen lawsuits. The suits say the ET-Plus, which is designed to give way and absorb the shock when hit by a vehicle, instead is prone to seizing up and spearing vehicles and their occupants. The legal battle between Trinity and Joshua Harman, the whistle-blower who says he discovered the undeclared and potentially deadly changes, was the subject of a June article in Bloomberg News.

Trinity has denied the units are flawed. It has said its failure to tell the FHWA about the modifications was inadvertent and that the changes didn't detract from the system's performance. There are about 200,000 Trinity units along U.S. roadsides, the FHWA has said.

**Raised Questions**

Transportation officials in several states began raising questions about the ET-Plus in 2012 to the FHWA, whose sign-off on the product's safety has opened up hundreds of millions of dollars in federal money for states that buy and install it.

The agency stood by its approval of the system, Bloomberg News reported in November, in an article that also described the close relationship between Trinity and the FHWA.

After the Texas jury verdict, the FHWA ordered Trinity to retest the unit. Those tests were successfully completed, the FHWA said in March. The agency has said its only concern in evaluating the ET-Plus is safety and "any suggestion to the contrary is ludicrous."

Suzi Emmerling, a spokeswoman for the Department of Transportation, which includes the FHWA, declined to comment on the grand jury investigation.

**Senator's Request**

Independent safety experts and lawmakers continue to raise questions about the ET-Plus and the FHWA's continued support of the unit. In March, U.S. Senator Richard Blumenthal asked Transportation Secretary Anthony Foxx to investigate the FHWA's actions over the past decade, during which it allowed Trinity systems to line U.S. roadways.

The Connecticut Democrat said the agency waited three years after it first heard about the changes to issue a public call for additional information. He described the latest crash tests as "rife with flaws" and governed by lax standards.

The FHWA has focused "on minimizing its own failings and, unconvincingly, continuing to stand by the devices and the manufacturer," Blumenthal said in a March 23 letter to Foxx.

The federal probe is being handled by U.S. Attorney Carmen Ortiz in Boston and the Federal Bureau of Investigation, according to the people familiar with it. The Inspector General of the Transportation Department is also working with the prosecutor, the people said.

Christina DiIorio-Sterling, a spokeswoman for Ortiz, and Kristen Setera, a spokeswoman for the FBI's Boston division, said their offices don't confirm or deny investigations.

Eric Weems, a spokesman for the Transportation Department's Office of Inspector General, declined to comment.

**'Cooperate Fully'**

"I'm not at liberty either to confirm or deny the existence of a DOJ investigation, but to the extent there is one, Mr. Harman will cooperate fully," Nicholas Gravante Jr., Harman's lawyer, said in an e-mail.

Federal investigators often begin gathering information before naming their targets, and in this case the focus of the probe isn't yet clear. Such probes have the potential to call out specific individuals, including company executives and government officials, for violations of federal law.

According to the Justice Department's website, the unit handling the criminal investigation prosecutes "federal offenses involving public corruption" as well as "civil rights prosecutions, and other cases of particular sensitivity."

37.     On this news, shares of Trinity declined $3.43 per share, over 9%, to close on April 22, 2015, at $32.82 per share, on unusually heavy volume.

38.     On April 24, 2015, in a conference call with investors, the Company confirmed that the U.S. Department of Justice has begun an investigation into Trinity, on this news, the Company's shares declined an additional $4.66 per share, or 14%, to close on April 24, 2015 at $28.70 per share on volume of over 13 million shares.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Trinity's securities between February 19, 2014 and April 23, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Trinity's securities were actively traded on the New York Stock Exchange (the "NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Trinity

shares were traded publicly during the Class Period on the NYSE.  As of January 31, 2015, Trinity had 155,668,747 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Trinity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Trinity; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.     The market for Trinity's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Trinity's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Trinity's securities relying upon the integrity of the market price of the Company's securities and market information relating to Trinity, and have been damaged thereby.

43.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Trinity's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Trinity's business, operations, and prospects as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Trinity's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects,

thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## **LOSS CAUSATION**

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased Trinity's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## **SCIENTER ALLEGATIONS**

47.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Trinity, his/her control over, and/or receipt and/or modification of Trinity's allegedly materially misleading misstatements and/or their associations with the Company which

made them privy to confidential proprietary information concerning Trinity, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

48.     The market for Trinity's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Trinity's securities traded at artificially inflated prices during the Class Period.   On September 19, 2014, the Company's stock closed at a Class Period high of $49.83 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Trinity's securities and market information relating to Trinity, and have been damaged thereby.

49.     During the Class Period, the artificial inflation of Trinity's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Trinity's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Trinity and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50.     At all relevant times, the market for Trinity's securities was an efficient market for the following reasons, among others:

(a)      Trinity stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      As a regulated issuer, Trinity filed periodic public reports with the SEC and/or the NYSE;

(c)      Trinity regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      Trinity was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

51.      As a result of the foregoing, the market for Trinity's securities promptly digested current information regarding Trinity from all publicly available sources and reflected such information in Trinity's stock price. Under these circumstances, all purchasers of Trinity's securities during the Class Period suffered similar injury through their purchase of Trinity's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Trinity who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Trinity's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Trinity's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Trinity's financial well-being and prospects, as specified herein.

57.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Trinity's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trinity and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Trinity's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Trinity's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Trinity's securities during the Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Trinity was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Trinity securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Trinity within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Trinity and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  April 28, 2015                     Respectfully submitted,

**THE KENDALL LAW GROUP, LLP**

/s/ Joe Kendall
JOE KENDALL
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
JAMIE J. MCKEY
Texas Bar No. 24045262
jmckey@kendallllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone:  214-744-3000
Facsimile:  214-744-3015 (Facsimile)

*Liaison Counsel for Plaintiff*

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

*Attorneys for Plaintiff*